Filed 4/19/22  P. v. Pardue CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B307663 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA463979) |
| v. | |
| JOSHUA PARDUE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Stephen A. Marcus, Judge.  Affirmed.

William G. Holzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel, Jr., Michael Katz and William H. Shin, Deputy Attorneys General, for Plaintiff and Respondent.

_____

On January 30, 2020, a jury convicted defendant and appellant Joshua Pardue of three counts of second degree robbery (Pen. Code, § 211)[1] and one count of attempted second degree robbery (§§ 211, 664). The trial court found that he had two prior "strike" convictions within the meaning of sections 667, subdivisions (b) through (i), and 1170.12, subdivisions (a) through (d), and two prior serious felony convictions within the meaning of section 667, subdivision (a)(1). Defendant was sentenced to 50 years to life in prison.

Defendant timely appealed, asserting that prejudicial errors occurred during trial which require reversal of the judgment. Specifically, he asserts that (1) the prosecutor improperly used peremptory challenges to dismiss African-American prospective jurors; (2) the trial court improperly admitted evidence of defendant's father's out-of-court identification; (3) the trial court improperly excluded demonstrative evidence of defendant's walk, tattoos, and teeth; (4) the trial court demonstrated judicial bias in front of the jury; (5) the trial court improperly refused to dismiss one of his prior strikes; and (6) cumulative errors resulted in an unfair trial. Finally, he asks that we review the sealed record of the trial court's in camera hearing for the undercover operation.

We affirm the judgment.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

# FACTUAL BACKGROUND

I. *Prosecution Evidence*

    A. <u>Robbery and attempted robbery at Horton & Converse Pharmacy in West Los Angeles</u>

    On the evening of October 20, 2017, a pharmacist, Safia Freije (Freije), and a pharmacy technician, Meynard Go (Go), were working at a Horton & Converse Pharmacy on Wilshire Boulevard in West Los Angeles. Two men came inside. One of them was in a wheelchair and one of them had a gun. Freije ran away. The armed man pointed the gun at Go's head, and demanded that he open the cash register and lie on the floor. Go complied. The gunman took the cash and both robbers left. Los Angeles Police Detective Tony Fitzsimmons identified defendant as one of the robbers based on the pharmacy's surveillance video.

    B. <u>Robberies at Bright Plaza Pharmacy in Whittier</u>

    Two days later, Gina Valdez (Valdez), a pharmacy technician, was working with the pharmacist and a clerk at Bright Plaza Pharmacy on South Whittier Boulevard in Whittier. Three men came into the pharmacy. One of them got out of a wheelchair and had a gun. They forced the employees onto the ground and into an office, took narcotics from the pharmacy's safe and money from Valdez's purse, and left. Valdez identified defendant in court as one of the robbers.

    C. <u>Defendant's admissions</u>

    Defendant had an audio-recorded conversation with an informant in jail. Defendant admitted that he falsely told the police that he did not recognize who was in the crime scene photos that they showed him. Defendant knew that those were photos of him. Defendant explained to the informant that the

3

police also showed him a photo of his car but he denied it was his when he spoke with them. Defendant told the informant that the car was not registered to him.

D. <u>Damaging document found on defendant's cellphone</u>

A security manual for pharmacies was found on defendant's cellphone.

E. <u>Cellphone location records</u>

Defendant's cellphone records showed that he was near the crime scenes during the crimes.

F. <u>Jail call between defendant and his girlfriend</u>

Defendant was arrested. During a recorded jail call, defendant told his girlfriend that his father had identified him in two videos. The identification hurt his feelings because it was the only reason he was in jail. The witnesses could not identify him, there were no fingerprints linking him to the robberies, and the videos could have been of anyone.

II. *Defense Evidence*

Detective Alejandro Galvan testified that Go and Freije could not identify defendant in a photo lineup.

A private investigator, Luis Reynoso (Reynoso), testified about defendant's tattoos and the way defendant walks. In Reynoso's opinion, defendant did not appear in the Bright Medical Plaza's surveillance video.

**DISCUSSION**

I. *No Batson[2] Error*

Defendant, who is African-American, contends that the trial court erred when it overruled his objection to the People's

---

[2] *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*).

4

peremptory challenges to four African-American prospective jurors.

A. Relevant proceedings

1. *Prospective Juror No. 7*

The appellate record does not include the voir dire of Prospective Juror No. 7 before the prosecutor excused him. Defendant's trial counsel stated that this juror "was an older gentleman . . . from South L.A.," who was married, had children, was retired, and previously worked in sales. He served on a prior jury, but the case settled. Counsel asserted that "there was no reason to kick him off. There was absolutely nothing there about him to let him go . . . . He didn't express any animosity towards police."

The trial court found that this individual belonged to a cognizable class, but that defendant failed to state a prima facie case. Nevertheless, it asked one of the prosecutors to explain his reason for excusing this juror. The prosecutor stated: "The reason, among other things, not only did we find, my partner and I . . . that [Prospective Juror No. 7] was sleeping at times during selection, he was also continuously providing outburst[s] and saying things like, 'that's right,' and, 'oh, yeah,' and, 'mm-hmm.'" Defense counsel responded that he did not hear any outburst and vehemently objected. He noted that the trial court did not admonish this juror. The trial court acknowledged this fact, but stated that while it did not see him sleeping, it "did hear him make an outburst."

The trial court then added: "Someone would say something, and he would yell out something. At the time I thought it was strange." After a recess, the trial court stated that the "court reporter made a notation in the record that someone

5

had shouted something.  I heard and saw" Prospective Juror No. 7 "shout something . . . and I believe he did it more than one time."  "I did not hear clearly what he said.  What it seemed to me is he was saying, you know, 'that's right,' or something like that, and I wondered about it, but that was all I thought."

Defense counsel argued that everything this prospective juror said was typical for a juror.  While the trial court did not disagree, it reiterated that defendant failed to present a prima facie case.  It noted that "there are a number of African Americans still on the jury and in the panel."  The prosecutor stated that according to his notes, when another prospective juror said that his brother had been "'punished too much' [Prospective J]uror No. 7] blurted out, 'mm-hmm.'"  The trial court responded, "Now that you say that, I'm actually going to concur with that, because that's exactly when he said something.  When they were talking about punishment he did say something.  I didn't hear exactly what he said, but he uttered some sounds.  I thought at the time that's, like, strange."

2. *Prospective Juror No. 14*[3]

Not all of the voir dire of Prospective Juror No. 8 is included in the appellate record.  He stated that he was in a car that was stopped by the police in New York and he testified about it there.  His testimony in that case was contrary to the testimony of the police officers.  One of the prosecutors asked him, "Can you see how I may have some concerns about you

---

[3]     Prospective Juror No. 14 eventually became Prospective Juror No. 8.  After this gentleman was excused, Prospective Juror No. 15 became Prospective Juror No. 8.  To avoid confusion between the two individuals, we refer to them by their original numbers.

sitting?" He replied, "Absolutely." The prospective juror stated that he did not have many feelings about police and if he "[got stuck] on it," he "might become a little sad." He added, "But I don't put 'em all in a group. I think most police officers are actually quite nice. I've had a few bad apples, but I'm not going to put them all in a group. I think, you know, they're cool. I don't have no problems." He said that he could be fair.

After the prosecution excused him, defense counsel stated that this was the second African-American juror that the prosecutor had excused. Counsel stressed that this juror had said that most police officers were good.

The trial court noted that the prosecution had excused two people from the same cognizable group, and that it was "the opposing party['s] burden to demonstrate that the challenges were made for neutral reasons." It asked one of the prosecutors to explain his reason for excusing this individual. The prosecutor explained that Prospective Juror No. 14 "mentioned stop and frisk as an issue that was negative for him within his overall beginning statement. But later, what really caught [our] attention . . . is he had testified in a prior case, it sounded like a [suppression] issue, and he testified against a cop, who I believe he had said was lying in his view as well." The prosecutor continued: "Given that perspective, it was my fervent belief that he would view this case through the lens of a defendant rather than through the lens of a victim or otherwise on the stand." Finally, the prosecutor noted that there was another African-American man still on the jury panel.

The trial court accepted the prosecutor's explanation as race-neutral. It noted that the prosecution had exercised eight peremptory challenges at that point, and only excused two

African-American jurors.  It added:  "I do not believe that . . . the defense . . . has met the burden of producing evidence sufficient to draw an inference that discrimination has occurred.  That's the *Batson* language."  Also, "there was nothing about this individual that was comparable to other jurors that were excused or not excused."

   3. *Prospective Juror No. 15*

  As with Prospective Juror No. 14, not all of the voir dire of Prospective Juror No. 15 is in the appellate record.  Defense counsel said to him that "some people say they have bad experiences/good experiences with the police.  Would you agree with me that you can be fair to [defendant], you'll be fair to the police as well; would you agree with that?"  He replied, "Yeah.  Although I've had bad experiences.  Yes, I'm a critical thinker, I'll make up my own mind in the situation.  Every situation is different."  This prospective juror agreed that he would judge each person individually, not as part of a group, and he would be willing to listen to all the witnesses, including the police.  He said that nothing would prevent him from doing that.

  The prosecutor then stated to the prospective juror, "I think [you said yesterday that] . . . you have a relative, a brother, I think, [convicted of] attempted murder.  I think you said something about he was good for the crime, but the punishment was too much."  He replied:  "I didn't say good for the crime.  I said I felt the punishment was extreme."  The prosecutor asked how it would impact his ability to serve as a juror.  He responded:  "It's not my job to render the punishment . . . so that would have no impact on me figuring out whether or not the crime was committed."  He believed that his brother "was treated unfairly,"

noting that his brother "got enhancements." But, he still believed that he could be fair in this case.

After the prosecutor excused this prospective juror, defense counsel made another *Batson* motion. He insisted that the prosecutor had no reason to excuse this juror. In fact, according to his notes, this prospective juror had a law enforcement job. When the trial court stated that it did not recall that, defense counsel suggested that maybe a relative was in law enforcement. The trial court then said, "I doubt seriously he had a law enforcement job. I don't have that in my notes."

The trial court then stated that this prospective juror was African-American and found a prima facie case. The prosecutor then summarized this prospective juror's remarks discussed above. He explained: "It didn't seem to me that he would be a juror who would see the case through the eyes of a victim testifying from the stand. It seemed to me he would be much more likely to focus through the lens of perhaps a defendant, like his own family member would see the case."

The trial court denied defendant's motion and found that the People had set forth a sincere, race-neutral reason for excusing Prospective Juror No. 15. It stressed that this individual's brother had been convicted of a very serious offense, attempted murder, and was serving a long prison sentence.

4. *Prospective Juror No. 19*[4]

One of Prospective Juror No. 19's sons was in prison for 25 years to life. He did not attend his son's trial and did not know anything about the facts of his son's case. But he agreed that it was based on felony murder. His son said that he was not guilty.

---

[4] Prospective Juror No. 19 eventually became Juror No. 9.

9

Because his son was 18 years old when he committed his crime, he was entitled to have the trial court reconsider his sentence after he served 15 years in prison.

Prospective Juror No. 19 was convicted of bank robbery in the 1970's when he was a juvenile. That conviction was expunged. In 1985, he was convicted of manslaughter. He was discharged from parole in 1996. Because this individual has this criminal record, the prison authorities would not allow him to visit his son. He believed that he was treated unfairly by the criminal justice system. He was charged with murder but pled guilty to manslaughter and avoided a potential sentence of 25 years to life. He was not mad at anyone who was involved in that case.

When asked about the bank robbery, Prospective Juror No. 19 stated, "[t]hat is one I did not commit but I was convicted of. But I'm not mad about it because I did not tell on the other person. That's hood credit but it doesn't count for much when I ended up in jail for 22 months." He stated that he could be fair to the prosecution, explaining, "I work with police officers every day now. I've become friends with some of them, and I know that there are wonderful people who do the same things that we [do]. They even buy me 20-dollar cigars." "[L]ife has taught me some stuff, because after I've been out, no problems, no traffic tickets, no nothing." "Sympathy and empathy—you know, I can empathize but the truth is the truth."

After the prosecution excused this juror, defense counsel brought another *Batson* motion adding, "This is another African American juror who has been excused by the prosecution." "[H]e didn't say anything that I thought rose to the level of a peremptory challenge." Because this was the fourth prospective

10

juror that the People had excused from the same cognizable class, the trial court found that defendant had made a prima facie case. The prosecutor then explained his reasoning for excusing this individual. After reiterating the voir dire discussed above, the prosecution did not believe that this prospective juror could imagine the case from the victim's perspective.

The trial court denied the motion,[5] explaining that there was a race-neutral reason because the juror's "family members [were] caught up in the criminal justice system." "[N]ot only did [this prospective juror] have a felony record, he actually indicated on both cases that he was unjustly accused."

### 5. *Jury*

After the jurors were sworn in, the trial court noted outside their presence that one alternate juror was African-American and one juror on the panel of 12 was either African-American or Hispanic. Defense counsel disputed that the juror on the panel was African-American.

### B. Relevant law

Both the state and federal Constitutions prohibit the use of peremptory challenges to remove prospective jurors based solely on group bias, such as race, gender, or ethnicity. (*Batson, supra,* 476 U.S. at p. 89; *People v. O'Malley* (2016) 62 Cal.4th 944, 974; *People v. Wheeler* (1978) 22 Cal.3d 258, 276–277 (*Wheeler*).) It is presumed that the prosecutor exercised peremptory challenges in a constitutional manner, and the appellant bears the burden of

---

[5]     The augmented reporter's transcript indicates that the trial court granted defendant's motion. In light of the trial court's remarks, this was obviously wrong. Either the trial court misspoke or the court reporter transcribed this comment incorrectly.

11

rebutting that presumption.  (*People v. Johnson* (2015) 61 Cal.4th 734, 755; *People v. Manibusan* (2013) 58 Cal.4th 40, 76.)

In determining whether the presumption of constitutionality is overcome, the trial court applies the well-established three-step inquiry set forth in *Batson*.  (*People v. Taylor* (2009) 47 Cal.4th 850, 885.)  "'First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race.  Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason.  Third, the court determines whether the defendant has proven purposeful discrimination.  The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.  [Citation.]  The three-step procedure also applies to state constitutional claims  [Citations.]'"  (*People v. Taylor*, *supra*, at pp. 885–886; see also *People v. Thomas* (2011) 51 Cal.4th 449, 473; *People v. Battle* (2021) 11 Cal.5th 749, 772 (*Battle*).)

The defendant is required to overcome only a "'low threshold'" to meet the first step of the *Batson* test.  (*Battle*, *supra*, 11 Cal.5th at p. 773.)  "It is satisfied simply by evidence sufficient to permit us to draw an inference that discrimination *may* have occurred. [Citation.]"  (*Battle*, *supra*, at p. 773.)  We consider whether all the relevant facts surrounding the excusal "''give[] rise to an inference of discriminatory purpose.'''"  (*Ibid*.)

"Certain types of evidence are especially relevant to this inquiry, including whether the prosecutor has struck most or all of the members of the venire from an identified group, whether a party has used a disproportionate number of strikes against members of that group, whether the party has engaged

prospective jurors of that group in only desultory voir dire, whether the defendant is a member of that group, and whether the victim is a member of the group in which the majority of the remaining jurors belong. [Citation.]" (*Battle*, *supra*, 11 Cal.5th at p. 773.)

At this stage, "[w]e may also consider nondiscriminatory reasons for the challenged strikes that are 'apparent from and "clearly established" in the record.' [Citation.]" (*Battle*, *supra*, 11 Cal.5th at p. 773.) But "we may do so only when these reasons 'necessarily dispel any inference of bias,' such that "'there is no longer any suspicion . . . of discrimination in those strikes.'" [Citation.]" (*Battle*, *supra*, at p. 773.)

"At the third stage of the *Wheeler/Batson* inquiry, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' [Citation.] In assessing credibility, the court draws upon its contemporaneous observations of the voir dire. It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her. [Citation.]" (*People v. Lenix* (2008) 44 Cal.4th 602, 613, fn. omitted.) The proper focus is on the subjective genuineness of the nondiscriminatory justifications given, not on their objective reasonableness. (*People v. Reynoso* (2003) 31 Cal.4th 903, 924.) A "'legitimate reason[]'" for excusing a prospective juror is not a reason that makes perfect sense, but one that is nondiscriminatory. (*Id*. at p. 916.)

13

"Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence support its conclusions. [Citation.] 'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges "'with great restraint.'" [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]' [Citation.]" (*People v. Lenix, supra*, 44 Cal.4th at pp. 613–614.)

C. <u>Analysis</u>

Applying these legal principles, we conclude that the trial court did not err.

Regarding Prospective Juror No. 7, the trial court correctly determined that defendant failed to establish a prima facie case when the prosecutor excused him. He was the first African-American prospective juror who was excused by a peremptory challenge. As the California Supreme Court recently iterated, "'Although circumstances may be imagined in which a prima facie case could be shown on the basis of a single excusal, in the ordinary case . . . to make a prima facie case after the excusal of only one or two members of a group is very difficult.' [Citation.]" (*Battle, supra*, 11 Cal.5th at p. 776, fn. omitted.) There was no reasonable inference that the prosecutor acted in a racially discriminatory manner.

And the prosecution rebutted any prima facie case regarding this individual. The prosecutor excused him because

14

he blurted out strange comments during voir dire when it was not his turn to speak.[6]  A reasonable prosecutor certainly would excuse a prospective juror behaving so oddly.

Urging us to reverse, defendant argues that his counsel told the trial court that Prospective Juror No. 7's "statements during jury selection were 'pretty typical'" and "[t]he court did not disagree."  While that may be true, the trial court also noted that the man's behavior was strange.

After Prospective Juror No. 7, the prosecutor excused three other African-American prospective jurors (Nos. 14, 15, & 19) for race-neutral reasons.[7]  Specifically, Prospective Juror No. 14 had testified in a prior case against a police officer who he thought was lying, prompting the prosecutor to believe that he would view the case through the lens of a defendant as opposed to a victim. Prospective Juror No. 15 had had bad experiences with the police. He also had a brother convicted of attempted murder, and Prospective Juror No. 15 believed that his brother had been treated unfairly and received an "extreme" punishment.  Last, Prospective Juror No. 19 had been convicted of two crimes, and he believed that he was treated unfairly by the criminal justice system.  Given that these race-neutral reasons are supported by the appellate record, the trial court did not err.  (*People v. Hardy* (2018) 5 Cal.5th 56, 82 [race-neutral reason that juror believed police treated him unfairly during prior arrest]; *People v. Reed* (2018) 4 Cal.5th 989, 1001 [race-neutral reason because juror's

---

**6**      The trial court agreed that Prospective Juror No. 7 did engage in this behavior.

**7**      Defendant concedes that the stated reasons for excusal were race-neutral under current case law.

brother had negative experience with law enforcement when he was convicted of robbery]; *People v. Winbush* (2017) 2 Cal.5th 402, 436 [juror's prior arrest was race-neutral reason]; *People v. Bryant* (2019) 40 Cal.App.5th 525, 537 [race-neutral reason that juror believed her nephew was treated unfairly in driving under the influence case].)

Furthermore, where, as here, the prosecutor accepts a prospective alternate juror from the cognizable class, and that juror serves as an alternate, this "further lessens any inference of discrimination." (*Battle*, *supra*, 11 Cal.5th at p. 777.)

Defendant asks us to consider recently enacted Code of Civil Procedure section 231.7[8] as "persuasive guidance on how to ensure appellant's constitutional right to an impartial jury."[9] We decline to do so.

---

[8] This statute prohibits the use of peremptory challenges based upon specific criteria. Pursuant to subdivision (e), 13 reasons are "presumed to be invalid unless the party exercising the peremptory challenge can show by clear and convincing evidence that an objectively reasonable person would view the rationale as unrelated to a prospective juror's race" among other groups. (Code Civ. Proc., § 231.7, subd. (e).) Included in the list of 13 is "having a negative experience with law enforcement or the criminal legal system," "[e]xpressing a belief . . . that criminal laws have been enforced in a discriminatory manner," and "[h]aving a close relationship with people who have been stopped, arrested, or convicted of a crime." (Code Civ. Proc., § 231.7, subd. (e)(1)-(3).)

[9] Defendant concedes that the statute is not binding. (Code Civ. Proc., § 231.7, subd. (i) ["This section applies in all jury trials in which jury selection begins on or after January 1, 2022"].)

16

II. *Defendant has not Shown that the Informant Could Present Exculpatory Evidence*

Defendant asks us to independently review the sealed record of the trial court's in camera hearing to determine whether the confidential informant's identity should have been disclosed to him.  On August 19, 2021, we granted his separate request to review that record.

"[T]he prosecution must disclose the name of an informant who is a material witness in a criminal case or suffer dismissal of the charges against the defendant."  (*People v. Lawley* (2002) 27 Cal.4th 102, 159 (*Lawley*).)  As defendant agrees, "[a]n informant is a material witness if there appears, from the evidence presented, a reasonable possibility that he or she could give evidence on the issue of guilt that might exonerate the defendant.  [Citation.]"  (*Ibid.*; *People v. Bradley* (2017) 7 Cal.App.5th 607, 620.)  It is the defendant's burden to produce "'"some evidence"'" on this score.  [Citations.]"  (*Lawley*, *supra*, at pp. 159–160.)

After independently reviewing the in camera record, we conclude that the trial court correctly determined that the informant's identity should not have been disclosed.  Defendant failed to make any showing that the informant could present exculpatory evidence.  Thus, there was no basis to disclose his identity.

III. *Defendant's Father's Out-of-Court Identification was Properly Admitted*

Defendant contends that his father's out-of-court identification of him was improperly admitted.

A. Relevant proceedings
    1. *Pretrial hearing*

As set forth above, in a recorded jail call, defendant told his girlfriend that his father, William Pardue (William),[10] had identified him in two videos; the identification hurt his feelings because it was the only reason he was in jail.

Before the prosecution case began and outside the jury's presence, the trial court held a hearing on admissibility of William's identification. In response to defendant's hearsay objection, the prosecutor replied that William's statement was not hearsay because it was not being offered for its truth. Rather, it was being offered to explain defendant's reaction. The prosecutor added that "we certainly can have our [investigator] come in and explain that he interviewed [William] and showed him photographs. And we don't have to get into the statement as to what [William] said." The trial court determined, "This is being offered for the nonhearsay purpose of showing that [defendant] has consciousness of guilt, because he learned that his father identified him and he . . . was hurt by that."

The trial court added that it would allow the prosecution "to introduce this. The contextual thing I think is still important, but . . . it's a sufficient foundation if they put on evidence that the father . . . participated in an identification . . . or whatever it is. And they don't ever have to say what he said. They only have to say that he said that, and then the reaction of the defendant . . . and the jury gets to decide whether or not that's

---

[10]    Because defendant has the same last name as his father, his father is referred to by his first name to avoid confusion. No disrespect is intended.

consciousness of guilt."  Finally, the trial court determined that it was not "a hearsay issue."

### 2. *Conversation with counsel at sidebar*

During its case-in-chief, the prosecutor asked Detective Fitzsimmons what William said when Detective Fitzsimmons showed William a photograph.  Defendant objected.  At sidebar, the trial court recalled that it had held a hearing on this issue.  It added that its prior ruling was not definitive, as far as it remembered.  When the trial court said that William's statement was hearsay, the prosecutor replied that this statement was not being offered for its truth.  Rather, it was relevant because defendant told his girlfriend that William identified him.  Thus, it showed defendant's guilty conscience, among other things.

The trial court stated that "there [was] a nonhearsay purpose" to the statement.  And, regardless, "the jury [was] going to find out that" William identified defendant "because they're going to get [defendant's] statement . . . in which he complains about" that.  Defense counsel acknowledged that the trial court had already determined that it would admit defendant's statement to his girlfriend.  But defense counsel complained that he could not cross-examine William about what he told Detective Fitzsimmons.  The trial court replied that the jury would learn anyway that William identified his son because defendant told his girlfriend that, thereby reducing any prejudice of William's statement to Detective Fitzsimmons.  The trial court added, "I have to consider the fact that contextually, there's no meaning to" defendant's conversation with his girlfriend, "unless you know this."  It continued:  "I'm going to tell the jury that we don't have [William] here, that it's not coming in for the truth of the matter."

19

### 3. *Trial court's explanation to the jury*

After this exchange, the trial court told the jury: "We're going to hear a statement now, and . . . I'm going to try to give you an admonishment to explain how to use this evidence. Normally when a witness is not before you, you keep hearing this objection 'hearsay,' if someone repeats what someone else said, and the person is not present before you, then normally the hearsay rule applies, and that statement can't come in, but there's lots of exceptions to the hearsay rule, first of all.

"Secondly, sometimes the statement can come in not for the truth that what the person said was true, but maybe to help explain something else, like for example if . . . hypothetically a police officer is testifying and he said, 'I came to the scene and I said, you know, where did the suspect go?' And the person who is at the scene says, 'He went that way,' and then the police officer runs that way to go find the person, that statement would come in, not for the truth that the person went that way, but to help explain why the officer ran down the block in that direction. So that is one example. There are other examples.

"But anyway, I'm going to allow the statement to come in that the officer got from Mr. William Pardue, but I'm going to advise you that it's not coming in for the truth of the matter, that what the father is saying is true, but it's coming in, and you will discover this, to help explain later testimony, . . . and the state of mind of somebody who heard about what happened, what is going to be described to you now.

"So I'm limiting it. You're not to accept what is being said is true based on this testimony, but you may consider it later on when other evidence comes in, and I will actually link it or tell

20

you when that other evidence comes in.  Anyway, I'm allowing it.  I've limited it."

4. *Prosecution's resumed examination of Detective Fitzsimmons*

The prosecutor asked Detective Fitzsimmons what William told him when Detective Fitzsimmons showed William a photo.  Detective Fitzsimmons replied that William said, "'That's [defendant] right there.  What did he do?'"  Before defendant objected, the trial court stated, "The last part is stricken."

5. *Trial court's conversation with counsel*

Later, outside the jury's presence, the trial court asked the prosecutor whether he was trying to get a mistrial by eliciting the stricken statement.  The prosecutor apologized and replied that he had seen the stricken statement before but had not focused on it and did not remember it.  The trial court explained, "There's a benign aspect to what he said.  You can look at it in two ways: what did [defendant] do because [Detective Fitzsimmons is] a police officer, [William is] asking what did [defendant] do; or it could also be taken in another context, what did [defendant] do now, meaning the suggestion that, you know, this is some kind of pattern."

Defense counsel said that he did not want a mistrial.

6. *Prosecution's continued case-in-chief*

During Detective Eduardo Aguirre's testimony, the trial court stated:  "I'm just going to clue the jury in, remember that we had the other officer testify this morning and I let it in not for the truth of the matter, it's linked to this, it's linked to how it may or may not have affected, if they identified the voices on the tape, the defendant.

"Does everybody understand what I'm saying?

21

"That's why it's coming in, as to whether or not it had an impact or effect on the state of mind of the defendant. Okay?" None of the jurors suggested that they were confused by this admonition. The trial court then admitted defendant's audio-recorded conversation with his girlfriend in jail.

B. Defendant forfeited his Evidence Code section 352 contention

Defendant argues that the trial court should have excluded the challenged evidence under Evidence Code section 352. But he did not object on that ground in the trial court. Therefore, he failed to preserve this contention. (*People v. Ervine* (2009) 47 Cal.4th 745, 777 [hearsay objection did not preserve Evid. Code, § 352 claim]; cf. *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 413 [relevance objection did not preserve Evid. Code, § 352 contention].)

Even if defendant had not forfeited his Evidence Code section 352 contention, it lacks merit. The trial court independently admitted defendant's statement to his girlfriend, which he does not challenge on appeal. That statement referred to this identification. Thus, Detective Fitzsimmons's testimony about this identification was not prejudicial. And it had probative value because it allowed the jury to understand the full context of defendant's admissions to his girlfriend. There was no error.

C. The trial court correctly admitted the identification because it was not hearsay

A statement is not hearsay if it is offered to prove consciousness of guilt, rather than the truth of the matter. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 157.) Here, the trial court correctly admitted William's identification of

defendant not to show that the identification was accurate, but to show that defendant believed that it was accurate, and he believed that William's cooperation with the police was damaging evidence. This evidence proved that defendant was conscious of his guilt. (Cf. *People v. Bowman* (2011) 202 Cal.App.4th 353, 366 [the defendant demonstrated consciousness of guilt by urging a witness not to cooperate with police].)

William's question to Detective Fitzsimmons, "'What did [defendant] do?'" was stricken from the record. We presume that the jurors followed the trial court's instruction that this was stricken. (*People v. Pearson* (2013) 56 Cal.4th 393, 414.)

D. <u>Any alleged error was harmless</u>

Even if the trial court had erred, any such error would have been harmless as a matter of law. If the trial court had excluded Detective Fitzsimmons's testimony about William's identification of defendant, the jury still would have known about that identification, as noted above. William's question to Detective Fitzsimmons, "'What did [defendant] do?,'" did not show that William knew that defendant did anything. It was merely a question that a concerned father asked a police officer.

Moreover, the other evidence of defendant's guilt was compelling. He admitted to the informant that he was the individual in the crime scene photos, and that his car was present. The cellphone records reflected that defendant was near both crime scenes during the offenses. Detective Fitzsimmons identified defendant as one of the robbers at Horton & Converse based on the surveillance video. Valdez identified defendant as one of the robbers at Bright Plaza Pharmacy. And, defendant's cellphone contained a security manual for pharmacies.

23

Defendant notes that the jury received a late discovery instruction regarding some of the cellphone evidence, which showed that defendant was near the Bright Plaza Pharmacy crime scene. But, as discussed *infra*, other cellphone records were timely disclosed and established the same fact. Given all the evidence, any error would have been harmless under any standard. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1308 [standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 837 (*Watson*) applies when a trial court erroneously admits hearsay]; *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)

IV. *The Trial Court did not Abuse its Discretion by Excluding Certain Defense Evidence*

Defendant argues that the trial court improperly excluded his demonstration of his tattoos, teeth, and manner of walking.

A. Relevant proceedings

During the testimony of defense witness Reynoso, defense counsel asked the trial court whether defendant could stand up and walk to the jury. Defense counsel "wanted to show [defendant's] mannerism, the way he walks. He also has a gap in his teeth. I asked . . . every witness, 'Did you see a gap?' I want to show the gap. . . . I [also] want the jurors to see in person what his neck looks like because . . . part of our defense is identity. He has tattoos on his right neck and so forth."

Implicitly referring to defendant's appearance in the surveillance videos, the trial court noted that defendant wore a sweater that covered much of his neck. It ruled that defendant could use photographs, rather than personally demonstrate his physical appearance, explaining that defense counsel had already "shown the tattoos to the ninth degree. I mean, you've had every possible picture of tattoos."

The trial court added that "[t]he walking part [was] problematic because [defendant] can walk in any manner he wants so I don't know how that could possibly be evidence to show how he walks because he can basically walk the way he thinks he should walk . . . ." And, the conditions at trial and at the crime scenes were not the same. Defense counsel replied that the conditions did not need to be identical. The trial court then noted that the witnesses were not even near defendant during the robberies. The implication was that they could not notice any tattoos that he had.

The trial court stated that this was an Evidence Code section 352 issue. It explained, "I think it's really problematic. You're creating a false situation that their viewing of him is just like the witnesses viewed him, and he's dressed differently, they were frightened of a robbery." Moreover, "[h]e's gotten up three or four times, taken off his glasses, looked at [the jury]." And, "I don't know when he got these tattoos. . . . I have no definitive proof . . . those were the tattoos he had at the time of the robbery. It's very easy to get tattoos." Defense counsel replied that an officer documented that defendant had tattoos when he was arrested. But, the trial court noted that defendant was arrested nine weeks after the robberies.

Ultimately, the trial court denied defendant's request.

B. Relevant law

When a party offers evidence of a demonstration "'to test the truth of testimony'" that a particular "'thing occurred,'" it "'is admissible only where (1) the demonstration is relevant, (2) its conditions and those existing at the time of the alleged occurrence are shown to be substantially similar and (3) the evidence will not consume undue time or confuse or mislead the

25

jury. [Citation.] The party offering the evidence bears the burden of showing that the foundational requirements have been satisfied.' [Citation.]" (*People v. Rivera* (2011) 201 Cal.App.4th 353, 363 (*Rivera*).)

"To be admissible, demonstrative evidence must satisfy two requirements: first the evidence must be a reasonable representation of that which it is alleged to portray; and second, the evidence must assist the jurors in their determination of the facts of the case, rather than serve to mislead them." (*Rivera, supra*, 201 Cal.App.4th at p. 363.) The demonstration "must accurately depict what it purports to show." It "must be relevant to an issue in dispute 'and "must have been conducted under at least substantially similar, although not necessarily absolutely identical, conditions as those of the actual occurrence."'" (*Ibid.*) However, "'"the physical conditions which existed at the time [of] the event"'" do not need to "'"be duplicated with precision,"'" and the proponent of the evidence is not required to show "'"that no change has occurred between the happening of the event and the time of the reenactment."'" (*Ibid.*)

The abuse of discretion standard applies to the trial court's exclusion of demonstrative evidence. (*People v. Miles* (2020) 9 Cal.5th 513, 587.)

C. <u>Analysis</u>

The trial court did not abuse its discretion. Because defendant could have gotten tattooed during the nine weeks between the robberies and his arrest, and because he could have concocted a phony manner of walking in the courtroom that did not depict the true way he walked, the trial court sensibly excluded this evidence.

Furthermore, evidence of defendant's tattoos and any gap in his teeth was not relevant if the witnesses did not see any tattoos or his mouth during the commission of the crimes. As the trial court pointed out, the witnesses were not near defendant during the robberies. Some witnesses avoided looking at him closely because they were afraid to do so or they were warned not to do so.

To the extent that the tattoos were relevant, the demonstration would have been cumulative as defendant had already showed the jury several photos of his tattoos. Similarly, evidence about defendant's manner of walking was cumulative as Reynoso had testified about it.

The court also excluded this evidence under Evidence Code section 352. It is well-settled that ""[w]e will not disturb a trial court's exercise of discretion under Evidence Code section 352 "*except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.""" [Citation.]" (*People v. Steskal* (2021) 11 Cal.5th 332, 357.) After all, the "trial court is better able to assess prejudice from the display of physical evidence." (*Ibid*.) For the reasons set forth above, the trial court did not abuse its discretion in excluding the subject evidence pursuant to Evidence Code section 352.

D. Any error would have been harmless

Even if the trial court had erred, any such error would have been harmless under either *Watson* or *Chapman*. As set forth above, the excluded evidence was cumulative, and there was very strong evidence of defendant's guilt.

V. *Alleged Judicial Misconduct*

Defendant contends that the trial court made disparaging remarks to his defense counsel, which prejudiced him. Specifically, he assigns eight incidents of error.

A. <u>Forfeiture</u>

"As a general rule, a specific and timely objection to judicial misconduct is required to preserve the claim for appellate review." (*People v. Seumanu*, *supra*, 61 Cal.4th at p. 1320.)

Although defendant asserts that there are eight incidents of bias or judicial misconduct, he only made a timely objection regarding the eighth alleged incident. Because he did not contemporaneously object on these grounds regarding any of the other alleged incidents, he has forfeited his objection on appeal.

Regarding the fifth alleged incident, defense counsel did tell the trial court that when it admonished him in front of the jury, "It hurts me and the defense." But that was insufficient. (*People v. Sturm* (2006) 37 Cal.4th 1218, 1237 [judicial misconduct claims are not preserved for appellate review if no objections were made on those grounds at trial].)

Regarding the sixth alleged incident, defense counsel objected shortly before the jury instructions were given that the trial court "admonished me in front of the jury . . . , impugned my integrity in front of the jury [during closing argument, and] hurt my client's Sixth Amendment right to adequate counsel." That was not a timely objection. (Cf. *People v. Rivera* (2019) 7 Cal.5th 306, 334 [defendant forfeited claim that prosecutor committed misconduct in closing argument when defendant raised it after closing argument was finished]; *People v. Lewis* (2008) 43 Cal.4th 415, 503 [defendant failed to preserve foundation objection when he did not raise it until relevant

28

witness left stand], disapproved on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 919–920; *People v. Cunningham* (2001) 25 Cal.4th 926, 989 [defendant failed to preserve suggestive identification issue when he did not raise it until he brought a section 1118.1 motion]; *People v. Mickle* (1991) 54 Cal.3d 140, 187, fn. 31 [defendant forfeited relevance objection when he waited until next day to raise it].)

In his written new trial motion, defendant argued that the trial court demonstrated bias in the third, sixth, and eighth incidents listed below.  But it was too late for defendant to raise those claims in a new trial motion.  (*People v. Vieira* (2005) 35 Cal.4th 264, 289 [defendant failed to preserve claim that trial court erred in voir dire when he did not raise it until new trial motion]; *People v. Memory* (2010) 182 Cal.App.4th 835, 856, fn. 6 ["Raising an evidentiary issue only belatedly in a motion for a new trial does not preserve the issue for appeal"].)

On appeal, defendant acknowledges that he failed to object. He argues that he is excused from objecting because an objection would have been futile.  We disagree.  "Only claims of 'pervasive judicial bias' are preserved in the absence of an objection, on the ground that objection in that instance may be futile."  (*People v. Armstrong* (2019) 6 Cal.5th 735, 799.)  Stated differently, "a defendant's failure to object does not preclude review 'when an objection and an admonition could not cure the prejudice caused by' such misconduct."  (*People v. Perkins* (2003) 109 Cal.App.4th 1562, 1567.)

Here, defendant has not shown either pervasive judicial bias or that an objection would have been futile.  He cites to only eight isolated incidents within 1,670 pages of reporter's transcript.  (*People v. Fudge* (1994) 7 Cal.4th 1075, 1107 ["A trial

29

court commits misconduct if it 'persists in making discourteous and disparaging remarks to a defendant's counsel . . . and utters frequent comment from which the jury may plainly perceive that the testimony of the witnesses is not believed by the judge, and in other ways discredits the cause of the defense . . .".) And he does not demonstrate how or why an objection would have been futile.

Defendant's reliance upon *People v. Sturm, supra,* 37 Cal.4th 1218 is misplaced. In that case, "the trial court 'belittled defense witnesses on several occasions' [citation], repeatedly answered questions (once incorrectly) for a defense witness [citation], 'disparaged defense counsel' on multiple occasions [citation], and 'interposed [its] own objections to questions asked by defense counsel' on 'numerous occasions' [citation]. The trial court also compounded its behavior by admonishing the jury that it was not biased against defense counsel, but doing so in a way that implied that defense counsel did not understand the rules of evidence." (*People v. Banks* (2014) 59 Cal.4th 1113, 1177–1178, overruled in limited part on other grounds in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3.) Those facts are a far cry from what occurred during this trial.

B. <u>Defendant did not demonstrate judicial bias or misconduct</u>

Regardless of this procedural obstacle, defendant has not demonstrated judicial bias or misconduct.

"'[T]rial judges "should be exceedingly discreet in what they say and do in the presence of a jury"' [citation] and their comments "'must be accurate, temperate, nonargumentative, and scrupulously fair'" [citation]." (*People v. Nieves* (2021) 11 Cal.5th 404, 477 (*Nieves*).) But, a ""'trial court has both the duty and the discretion to control the conduct of the trial.'"" (*Ibid.*) ""'[I]t is

30

well within [a trial court's] discretion to rebuke an attorney, sometimes harshly, when that attorney asks inappropriate questions, ignores the court's instructions, or otherwise engages in improper or delaying behavior."'" [Citation.]" (*Nieves*, *supra*, at p. 477.) "A trial court should of course refrain from making comments before the jury that might suggest it has allied itself with the prosecution." (*People v. Seumanu*, *supra*, 61 Cal.4th at p. 1320.) Thus, as set forth above, a "'trial court commits misconduct if it "persists in making discourteous and disparaging remarks to a defendant's counsel."'" (*Ibid*.)

1. *Defense counsel tried to inject irrelevant evidence to promote sympathy for defendant*

At trial, defendant tried to introduce evidence that defendant had "meningitis of the brain" that was "killing him." The prosecution objected, and the trial court sustained the objection, stating: "If you understood [Evidence Code section] 356, you would understand what [the prosecutor's] saying."

On appeal, defendant contends that the trial court displayed bias when it made this comment in front of the jury. He is mistaken. The trial court told defense counsel a moment later at the bench that as far as it understood, defendant never told the police, "'I can't do the interview or I don't understand what you're saying or something because of my brain condition.'" The trial court invited defense counsel to tell it that it was wrong about that. But defense counsel did not do so. Therefore, the trial court explained that his attempt to introduce evidence of defendant's meningitis was merely a "pitch for sympathy." And as the trial court explained at the new trial hearing, it believed that defense counsel committed a "flagrant foul" by making "a pitch for sympathy without any relevance at all to this case." For

31

that reason, the trial court had the discretion to rebuke counsel for engaging in improper behavior.  (*Nieves*, *supra*, 11 Cal.5th at p. 477.)

       2.  *Defense counsel tried to introduce questionable evidence in the jury's presence without first giving the trial court the opportunity to determine whether the evidence was relevant and unduly prejudicial*

When defendant asked the trial court to have defendant stand up and walk over to the jury, the trial court stated:  "Let's approach.  This is not a proper way to do this."  Defendant argues that the trial court's comment was rude.

Because the proffered evidence was subject to the trial court's broad discretion, defense counsel should have given the court an opportunity outside the jury's presence to consider the evidence carefully, and rule on whether to admit it.  Instead, defense counsel asked the trial court for permission in front of the jury.  He did not alert the trial court in advance, outside the jury's presence.

The dialogue that occurred at side bar demonstrates the trial court's understandable frustration with defense counsel.  The trial court stated to defense counsel:  "I've never seen anybody without informing the court before they're going to do that ask in front of a jury, never in my entire career."  Defense counsel apologized.

Despite its frustration, the trial court expressed only slight annoyance about this issue in front of the jury.  It did not demonstrate judicial bias.

3. *In closing argument, defense counsel tried to undermine the trial court's ruling that the prosecution was not required to disclose information about the informant*

Defendant complains that the trial court admonished his trial counsel during closing argument when his attorney repeatedly told the jury that it did not know anything about the informant's identity. At the new trial hearing, the trial court correctly explained why this did not amount to judicial misconduct or bias. It stressed that it held an in camera hearing about whether the prosecution had to disclose information about the informant to defendant. Defense counsel stated, "I wasn't percipient to that." The trial court replied, "But I made a ruling after the in camera hearing." He acknowledged, "Yeah, that we couldn't know who was the identity of the person." He insisted, "But that doesn't preclude me from saying to the jury: 'You don't know who the identity is.'"

Defense counsel's explanation was meritless. When a court rules that the prosecution is not required to disclose information to the defense, defense counsel is not allowed to undermine that ruling by encouraging the jury to speculate about what that undisclosed information was. As the trial court explained at the new trial hearing, this "seemed to me to [violate] the court's ruling that the identity of the [informant] was confidential." The trial court was allowed to admonish defense counsel for his improper argument. (*Nieves*, *supra*, 11 Cal.5th at p. 477.)

4. *Defense counsel falsely suggested to the jury that the prosecution misled it about the audio recordings*

Immediately after the last ruling, defense counsel said this: "But one thing we do know is that that was deeply edited. And there were many questions I was asking Detective Aguirre: 'Was

this on there?'  Remember I had the transcript and I was showing it to him.  No, this wasn't on— this was said, but they didn't play that in front of you.  This was said, but they didn't play that in front of you.  In other words, had I not asked that, you never would have known that, because they only played the edited version of what was said.

"And so I think that puts that *Perkins*[11]—they call it 'a *Perkins* operation,' but I would call it 'a trap.'  They call it 'an agent.'  I would call it 'Mr. X.'  And I'm not going to dwell on that, I'm going to move on now, but I want you to think about that.  When you think about what was said, did we ever get a chance to see anything of what was said?  Was there any video?  Did we ever get a chance to see that?  Think in your mind's eye, have a picture in your mind's eye.  It's got to be blank because you didn't get to see anything.  So it was like a star chamber, I would call it.  Like a secretive operation.  Secretive.  You see I can't even really talk about it too much.  So you are the ones who decide what is fair.  You decide, 'was that fair?'

"Then there was an interview by Detective Fitzsimmons, and Detective Fitzsimmons told you that the interview he did with [defendant]—let me back up.

"When the prosecution put on the interview, we didn't know that it was edited.  When I started to question, we found out that it was edited, that what they showed to you was an edited version.  And you know that because I kept showing Detective Fitzsimmons the transcript, and it was probably, you know, an inch and a half thick, and you know that you got about

---

11      *Illinois v. Perkins* (1990) 496 U.S. 292.

30 pages of what was said. So we know that it was edited. The question would be: What did they take out? That's the question.

"You also know that it wasn't the whole truth of what was said. It wasn't the whole truth."

The trial court sustained the prosecutor's objection. Defense counsel then stated, "You didn't get a chance to hear when he was making a denial of doing the robbery." The trial court sustained the prosecutor's objection again. At the bench, the trial court told defense counsel, "You could have played the entire tape." It added: "The argument you're making is that somehow this was underhanded, and that's just false. It was a choice of what to play. Either side could choose what to play. He chose what he wanted, and you could choose what you wanted. . . . [¶] . . . [¶] You could have played it all." Thereafter, the trial court stated: "[T]he thing you're arguing is that somehow there's something on the tape that is not in evidence; there's something in the tape that is somehow the truth or the truth was not brought out, so you're arguing evidence not in this case. That is the problem with that."

Defense counsel asserted that just before the sidebar conference, he was referring in closing argument to the editing of the police interview of defendant. He implied that he was not referring to the editing of the informant's conversation with defendant. Defense counsel noted that defendant's denial to the police did not appear in the partial transcript or partial audio recording of the police interview that the prosecution presented. The trial court told defense counsel that he could argue that point to the jury, but stressed that his closing argument had been "more than that."

Defendant complains that this was judicial bias. He is incorrect. It is important to understand the context of this sidebar conference. Detective Fitzsimmons testified on cross-examination that the jury received only part of the transcript of his interview with defendant, and only part of the audio recording of that interview. When defense counsel asked Detective Fitzsimmons whether they were "edited," the trial court stated, "There were portions of it played, and it was okay with the court that only portions were played. It was not edited in any way. Just portions were played."

Detective Fitzsimmons agreed that when defendant spoke with him, defendant denied committing the robberies. But Detective Fitzsimmons could not find defendant's denials in the transcript that defense counsel showed him. This was not a sudden revelation during cross-examination of Detective Fitzsimmons. Even before Detective Fitzsimmons testified, any reasonable juror would have understood it. The prosecutor had already introduced defendant's conversation with the informant. And defendant told the informant that he falsely denied to the police that he appeared in the photos from the surveillance videos of the robberies. Also, even before trial, defense counsel knew very well that defendant denied to the police during his audiotaped interview with them that he participated in the robberies. The prosecutor filed a pretrial brief about this, attaching the relevant part of that interview transcript. And the parties discussed this with the court, before voir dire was complete. Thus, the editing of the police interview transcript was no surprise to defense counsel.

Nor was it material that the jury only saw part of the police interview transcript, or heard only part of that interview. The

jury knew about defendant's denial to the police. And in the last excerpt from closing argument quoted above, defense counsel oscillated between discussing the transcript of defendant's conversation with the informant, and discussing the transcript of defendant's interview with the police. Under these circumstances, the trial court was justly concerned that defense counsel was falsely suggesting to the jury that the prosecution had acted dishonestly.

5. *Defense counsel inaccurately told the jury that the prosecution never disclosed certain cellphone records to him when the prosecution obtained those records during the trial and delayed disclosure to him for two days*

When a prosecutor obtains new evidence during trial, he or she is obligated to give it to the defendant immediately. (§ 1054.7 ["If the material and information becomes known to, or comes into the possession of, a party within 30 days of trial, disclosure shall be made immediately"].) If the prosecutor turns over that evidence during trial on the same morning that he or she obtains it, the prosecutor complies with this obligation. (*People v. Verdugo* (2010) 50 Cal.4th 263, 287.)

Here, defense counsel received timely discovery that defendant's cellphone connected three times with a cellphone tower near the Bright Plaza Pharmacy in Whittier, approximately when the crimes at that pharmacy occurred. However, during trial, the prosecution learned for the first time about new evidence that defendant's cellphone connected with that tower 34 times. The prosecution delayed two days before it disclosed this new evidence to defense counsel. After a contested hearing on this issue, the trial court decided to instruct the jury

37

that the prosecution provided late discovery regarding the 34 cellphone connections to the tower.

During closing argument, defense counsel read out loud the delayed discovery instruction.  He stated that the instruction referred to "[t]he call detail records for the 34 hits east of the 710 freeway from the phone taken from" defendant.  He added that the prosecution "failed to disclose those records as well, until—well, I don't think they ever disclosed those records actually."  After the prosecution objected, the trial court stated, "The jury is told to disregard the last comment.  That is not evidence in the case.  And the defense counsel is admonished not to do that.  That's not proper."  Defense counsel stated, "So I think what they're saying is that they disclosed these records in—I just want to make sure I get this right."

At sidebar, the trial court told defendant's trial attorney, "You're being outrageous.  We said that the instruction was going to be it, and it was not going to be any dates, and it wasn't going to be any time; that instruction embodies all that can be said to the jury.  And again you're arguing evidence that is not in the record."  "In addition, . . . you're testifying again as a witness."  The trial court also told defense counsel that he "tend[s] to go over the line.  I'm really losing some faith in you . . . that you're going to argue legitimately."

Defense counsel complained that the trial court admonished him in front of the jury.  Specifically, he said, "It hurts me and the defense."  The trial court replied, "Then I'll forget about doing any more, but just argue what is in the case?"  Defense counsel stated, "Okay.  I'm sorry.  Thanks."

After closing arguments, the trial court instructed the jury with CALJIC No. 2.28, which provides, in relevant part:  "The

prosecution and the defense are required to disclose to each other before trial the evidence each intends to present at trial so as to promote the ascertainment of the truth, save court time and avoid any surprise which may arise during the course of the trial. Delay in the disclosure of evidence may deny a party a sufficient opportunity to subpoena necessary witnesses or produce evidence which may exist to rebut the non-complying party's evidence. [¶] Disclosures of evidence are required to be made at least 30 days in advance of trial. Any new evidence discovered within 30 days of trial must be disclosed immediately. In this case, the People failed to timely disclose the following evidence: [¶] . . . [¶] 2. The call detail records for the 34 hits east of the 710 freeway from the phone taken from [defendant] on 12/28/17. [¶] Although the People's failure to timely disclose evidence was without lawful justification, the Court has, under the law, permitted the production of this evidence during the trial. [¶] If you find that the delayed disclosure was by the prosecution, and relates to a fact of importance rather than something trivial, and does not relate to subject matter already established by other credible evidence, you may consider that delayed disclosure in determining the believability or weight to be given to that particular evidence."

Contrary to defendant's contention, the trial court was not biased against defense counsel and did not commit misconduct. Defense counsel was simply wrong when he told the jury in closing argument, "I don't think they ever disclosed those records actually." As set forth above, the prosecution simply delayed disclosure for two days.

Significantly, the trial court gave defendant the appropriate remedy by tailoring the jury instruction, which

39

defense counsel knew about before closing argument. Because the trial court properly corrected defense counsel's error, it did not err. (See *Nieves*, *supra*, 11 Cal.5th at p. 477.)

6. *Defense counsel improperly implied in closing argument that the jury should not consider an exhibit that was properly admitted outside the jury's presence*

When the prosecution first tried to obtain the relevant cellphone records, defendant's cellphone carrier, T-Mobile, responded in writing that there were no records. This was Exhibit No. 28. Later in the investigation, the prosecution obtained the T-Mobile records by executing a search warrant and a replacement affidavit certifying that the prior declaration had been submitted in error. The cellphone records, which showed that defendant's cellphone was in the area of the two crime scenes at the times of the crimes, were presented to the jury in a PowerPoint presentation during the testimony of Romy Haas, a crime analyst with the Sheriff's Department. But the prosecution did not ask to have these T-Mobile records admitted into evidence before the close of its case.

Out of the jury's presence but with defense counsel present, the trial court denied defendant's section 1118.1[12] motion. The trial court then allowed the prosecution to reopen its case to substitute the original T-Mobile declaration (Exh. No. 28) with

_____

[12] Section 1118.1 provides, in relevant part: "In a case tried before a jury, the court on motion of the defendant . . . , at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged . . . if the evidence then before the court is insufficient to sustain a conviction."

the new corrected one, along with the cellphone records (Exh. No. 46). Although Exhibit No. 46 was a substitute for Exhibit No. 28, both exhibits were admitted into evidence.

In closing argument, defense counsel stated: "So when you look over at People's 28, and I would ask you to look at this in the jury room, do you see in the middle where it says, 'No records provided. T-Mobile does not store or maintain documents or tangible things which match the description of records [sought] . . . .'

"This is a problem . . . . No document was ever shown to you in this Court from a witness that changed this in any way." The trial court interjected: "I'm going to tell the jury that there's a subsequent document that was admitted relating to this that . . . relates exactly this . . . . It will also discuss the records involved here. So I think that would be unfair to tell the jury [what defense counsel said], knowing that the other document exists, and they will get to see it, and it was admitted into evidence."

Defense counsel was undeterred. He continued: "There is another document that's submitted at the end of the trial, that His Honor was talking about, but what we heard in this case, what we saw in this case from—with our eyes and our ears, was this document, People's 28."

Later, outside the jury's presence, the trial court told defense counsel: "I don't think you're being honest, and I think it's very disingenuous to make this argument, it's a misleading argument to say that the jury should not consider the document that is 4[6]. It was admitted into evidence. It's evidence in this case . . . . [Y]ou don't need any testimony for that document. It's a self-authenticating document. . . . Honestly, I don't want to get

involved at the moment, but I am pointing that out. Because you basically told the jury, 'Don't look at 4[6]. Don't consider it,' even though it's admitted into evidence in this case, and it is clearly absolute evidence. I don't like the argument. I'm making that clear. And I believe that the prosecutor can respond to that argument in a manner that deals with the misleading quality of the argument."

Defense counsel responded, "I'm sorry, Your Honor, that you felt that way." The trial court stated, "I've explained why. You seem to suggest that they shouldn't consider something that was admitted into evidence. And . . . you never mention the second document." Defense counsel replied that he was about to do that before the court interrupted his closing argument. The trial court disagreed. When the jury returned, defense counsel continued with his closing argument and acknowledged Exhibit No. 46.

After the prosecutor's rebuttal argument, the trial court told the jury that Exhibit No. 46 was admitted outside the jury's presence, and the jury could consider it.

Contrary to defendant's suggestion, the trial court did not commit misconduct and was not biased. When an attorney makes an improper closing argument, the court has a duty to intervene. (See *Nieves*, *supra*, 11 Cal.5th at p. 477.) That is exactly what happened here. Defense counsel falsely implied that the jury should put great weight on Exhibit No. 28 because it was the only cellphone records that the jury had seen. Even after the trial court pointed out that his argument was unfair, defense counsel went right back to his misleading argument. It was wrong for defense counsel to argue that because the jury was present when the trial court admitted Exhibit No. 28, it was more

42

reliable evidence.  Although defense counsel told the trial court that he was about to explain Exhibit No. 46 to the jury, the trial court had the discretion to determine, as it seemingly did, that this assertion was not credible.

7.  *Defense counsel made a mistake about exactly what the trial court judicially noticed, and the court's response was not misconduct or evidence of bias*

Near the beginning of the prosecution's case, the trial court granted the People's request for judicial notice that defendant and one codefendant were present at the preliminary hearing on April 10, 2019.  During closing argument, defense counsel asserted that the trial court took judicial notice that defendant was in court when Valdez testified on October 10, 2019.  The trial court interjected that it did not do that, it did not know who was there, and "[t]he evidence is whatever it is regarding that."

Later, outside the jury's presence, the trial court stated that it could not find its notes about whether it took judicial notice that defendant was present in court on a prior date.  It believed that it took judicial notice that three defendants were present.  Defense counsel replied that only two were present.  The trial court then stated:  "I want to get it right, and if it's somewhere, during the lunch hour you can show me where I took judicial notice, then I will tell it specifically to the jury."  Defense counsel did not follow up on that suggestion.

Despite defendant's assertion, this was not evidence of judicial bias or misconduct.  Defense counsel misstated the point that the trial court judicially noticed; there is no evidence that the trial court took judicial notice that defendant was present in a courtroom on October 10, 2019.  Despite the trial court's

43

invitation to show proof of that judicial notice, defense counsel failed to do so.

8. *The trial court did not commit misconduct or display bias when it corrected its legal error, told the jury that it mistakenly admonished defense counsel, and noted that he had objected on a proper ground*

During the prosecutor's rebuttal argument, defense counsel objected on the ground of prosecutorial misconduct. On one occasion, the trial court overruled the objection but told the jury that the prosecutor's argument was "not appropriate" and should be disregarded. On another occasion, the trial court admonished defense counsel in front of the jury that this was an improper objection. The trial court said that it told him about seven times not to make speaking objections. After the parties discussed this issue with the trial court outside the jury's presence, the trial court recognized that prosecutorial misconduct was a proper ground for an objection.

Shortly thereafter, the trial court corrected its mistake at the outset of the jury instructions, stating: "The Court wants to indicate that it made a mistake; it was wrong when I admonished [defense counsel] for saying 'prosecutorial misconduct.' It was my understanding that that is not a proper, evidentiary objection. I thought the objection should be, like, 'improper argument,' instead of prosecutorial misconduct, but I checked during the break. He is correct. That is a proper objection, and so that would not be a speaking objection. That would be a proper objection. And so I let [defense counsel] know that, and I'm letting you know, that that was a proper objection, the 'prosecutorial misconduct' language, which I thought was not."

44

This was not judicial bias or misconduct. Defense counsel was vindicated on this point in front of the jury. No reasonable juror would have held it against him. He stood up for himself and got the court to admit its honest mistake.

C. <u>Any alleged error was harmless</u>

"We consider the cumulative effect of the trial judge's [alleged] misconduct in order to assess prejudice that may arise from a variety of factors." (*Nieves, supra,* 11 Cal.5th at p. 499.) As our Supreme Court has observed, "the timing of a judge's improper remarks may increase their potential for prejudice, such as comments made during counsel's closing argument [citation] and comments that interfere with the defense presentation of evidence [citation]. The frequency of improper comments is another consideration." (*Nieves, supra,* at pp. 499–500.)

Any alleged judicial misconduct was harmless here. The trial court told defense counsel that he was "a very good lawyer." And it did not treat the prosecutors any better than it treated defense counsel. In fact, the trial court admonished or corrected the prosecutors in front of the jury, sometimes curtly.[13] Therefore, the jury could not have inferred that the court preferred the prosecutors.

Furthermore, the alleged judicial misconduct did not affect the outcome. In front of the jury, the trial court announced that it was wrong when it admonished defense counsel during the prosecutor's closing argument, and that defense counsel was

---

[13] Outside the jury's presence, the trial court repeatedly spoke abruptly to the prosecutors, expressed impatience with them, and criticized their arguments.

45

right. And, as set forth above, there was compelling evidence of defendant's guilt. (*Nieves, supra,* 11 Cal.5th at p. 502 ["we are not persuaded "'that the verdict resulted from the conduct of the judge and not from the evidence"'"].)

VI. *Alleged Error in Refusing to Strike any of Defendant's Prior Strikes*

Defendant contends that the trial court abused its discretion by declining to strike one of his prior "strike" convictions.

A. <u>Defendant's record</u>

Defendant was 41 years old when he committed the current crimes in October 2017.

In 1992, juvenile petitions were sustained against him for petty theft and vehicle theft. In 1994, a juvenile petition was sustained against him for burglary. In 1995, when defendant was an adult, he was convicted of misdemeanor burglary. He was sentenced to jail for 30 days and placed on probation. In 1996, defendant was convicted of misdemeanor grand theft, misdemeanor vehicle theft, and misdemeanor evading a police officer, causing injury. He was sentenced to one year in jail and placed on probation. Later that year, he violated probation and was sentenced to prison for two years. In 1997, he was convicted of misdemeanor driving under the influence of alcohol and was sentenced to jail for six months. Later that year, he was convicted of felony second degree burglary and sentenced to prison for one year four months.

In 1999, defendant was convicted of first degree burglary. He was sentenced to jail for 29 days and placed on probation for five years. In 2000, defendant was convicted of selling or furnishing marijuana or hashish. He was sentenced to jail for

one year and placed on probation for three years. In 2002, he was convicted of felony burglary and sentenced to prison for two years. Also, his probation from 2000 was revoked and he was sentenced to prison for three years in that case. In 2005, defendant was convicted of possession for sale of oxycodone, hydromorphone, and hydrocodone. He was sentenced to confinement for five years and placed on supervised release for three years.

In 2012, defendant was convicted of two counts of felony burglary. He was sentenced to prison for four years. In 2016, he was convicted of possession of a weapon by a prisoner. He was sentenced to prison for two years eight months. When defendant was released from prison, he failed to submit to testing for narcotics and enroll in a substance abuse program. According to the consolidated criminal history reporting system, he was classified as mentally disturbed.

B. <u>Probation officer's comments</u>

The probation officer stated that defendant continued his pattern of criminal conduct that began when he was a juvenile. In the current crimes, he showed a lack of regard for other people and their property. His actions were callous, deliberate, and premeditated. The probation officer said that defendant needed to be held accountable. She noted that it was not clear why he committed these crimes. She suggested that he might have some anger, theft, and mental health problems that need to be addressed. The probation officer found that defendant is a danger to the community. She could not interview the victims, but she concluded that they apparently feared for their lives and safety. She noted that the victims were fortunate to avoid serious injury. Defendant had been on probation before and in prison

47

multiple times. But he continued to commit crimes. The probation officer concluded that defendant should be sentenced to prison again.

The probation officer found seven aggravating factors. The manner of the crimes suggests that they were carried out with planning, sophistication, or professionalism. The crimes involved the taking of property of great monetary value. The crimes involved great violence, great bodily harm, or other acts showing a high degree of cruelty, viciousness, or callousness. Defendant engaged in violent conduct that shows he is a serious danger to society. His prior convictions and sustained juvenile petitions are numerous or increasingly serious. He performed unsatisfactorily on prior probation and parole. And he was on postrelease community supervision when he committed the crimes.[14] The probation officer found no mitigating factors.

C. The trial court's ruling

Defendant filed a written motion and several replies to the People's opposition under *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*).

After entertaining oral argument, the trial court denied defendant's *Romero* motion. It stated that it would "do the *Romero* motion by the book" and would "start out by saying" that the current crimes were "not the biggest thing in this whole discussion." According to defendant's statement to the police, he was "all in on the robbery," planned a different robbery, and

---

[14] An eighth aggravating factor was listed in the probation report (defendant was armed with a weapon or used one), but the trial court found in another context that that was not true.

"according to what I read," provided the gun for that robbery.[15] "On the other hand, [defendant] does deserve some credit for helping solve [a] murder, even if he was mostly motivated by the self[-]interest of trying to reduce his case. He helped out. He did mouth some of the correct words; he said he was concerned about the closure for the family of the victim and so forth." Therefore, "[i]t's a very mixed bag. It's certainly not something that would really save the day for" defendant.

Citing *People v. Williams* (1998) 17 Cal.4th 148, the trial court acknowledged that it was required to consider defendant's personal circumstances and history, as well as his rights and the rights of society. Defendant's two prior "strike" convictions were for first degree burglary in 1999 and 2002. But the court explained that it must deduct the time he spent in prison to determine the remoteness of those prior convictions. It added that there was no suggestion that defendant used weapons or violence during those prior burglaries or that anyone else was present during them.

The trial court found that defendant "has a terrible past criminal record." It was "just awful." It stressed that defendant "was consistently in prison or jail between the strikes and the present offense[s]. He's racked up four additional felonies and misdemeanors." He spent 15 and a half years in prison between 1999 to 2017. There were less than three consecutive years in which defendant was free from custody and did not commit a crime. Thus, the trial court concluded that defendant's prior

---

[15]    Defendant made a statement to the police regarding a different robbery that resulted in a murder by an accomplice. Defendant was not prosecuted for that crime.

"strike" convictions were not remote. When he committed the current crimes, he was on both federal and state probation. "At least two of [his] prior felonies involved weapons of violence," including "evading police officer causing injury or death." And all four current convictions were "strikes."

The trial court explained: "I somehow worked it out that he spent about 90 percent of his life incarcerated, either in the juvenile system or adult corrections. I don't know how I did that but I must have done a mathematical formula." It noted that a defendant could be considered a career criminal for purposes of the "Three Strikes" law even if his prior convictions were not principally violent or serious, and defendant has "quite a number of" prior burglary convictions that were not serious or violent.

Although defendant suggested "that he has a drug problem . . . the court did not really find evidence of this in his criminal history." The trial court elucidated: "I'm not saying he doesn't. I don't have any actual knowledge whether he does. But he only had drug offenses in 2000 and 2005, and both of those involved selling drugs."

Furthermore, the trial court found that the current offenses involved planning and sophistication, based on the way they were committed, including the use of a wheelchair. It also found that they "involve violence and the threat of great bodily harm, while other acts disclose a high degree of cruelty, viciousness, or callousness." The trial court continued: "I'm not saying that [defendant] exactly did that, but he has to take [responsibility] as an aider and abettor for what anybody else does." And the court found that his prior convictions were increasingly serious.

There was one mitigating factor. Defendant helped the police solve a murder. The trial court expressly gave him credit

50

for that.  But based on defendant's criminal record and his new "strike" convictions, the trial court declined to strike any of his prior "strike" convictions.

D. Relevant law

"'[T]he Three Strikes initiative, as well as the legislative act embodying its terms, was intended to restrict courts' discretion in sentencing repeat offenders.'  [Citation.]  To achieve this end, 'the Three Strikes law does not offer a discretionary sentencing choice, as do other sentencing laws, but establishes a sentencing requirement to be applied in every case where the defendant has at least one qualifying strike, unless the sentencing court "conclude[s] that an exception to the scheme should be made because, for articulable reasons which can withstand scrutiny for abuse, this defendant should be treated as though he actually fell outside the Three Strikes scheme."'  [Citation.]"  (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)  "'[I]n ruling whether to strike or vacate a prior serious and/or violent conviction allegation or finding under the Three Strikes law, . . . or in reviewing such a ruling, the court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies.'  [Citation.]"  (*People v. Carmony*, at p. 377.)

We "review a trial court's ruling on a *Romero* motion under the deferential abuse of discretion standard, which requires the defendant to show that the sentencing decision was irrational or arbitrary.  [Citation.]"  (*People v. Avila* (2020) 57 Cal.App.5th

1134, 1140.) "Only extraordinary circumstances justify finding that a career criminal is outside the Three Strikes law." (*People v. Avila*, *supra*, at p. 1140.)

E. <u>Analysis</u>

Applying these legal principles, we readily conclude that this was not an extraordinary case that falls outside the ambit of the Three Strikes law. Defendant had a "terrible" and "awful" criminal record. He "was consistently in prison or jail between the strikes and the present offense[s]." In fact, he was in prison for 15 and a half years between 1999 to 2017. There were less than three consecutive years in which he was free from custody and did not commit a crime. Thus, the trial court did not abuse its discretion in finding that the prior "strike" convictions were not remote.

Furthermore, as the trial court found, "[a]t least two of [defendant's] prior felonies involved weapons of violence," including "evading police officer causing injury or death." Although defendant did not personally use a weapon during the current crimes, he participated in those crimes, which involved acts of violence. And, he caused psychological trauma to the victims.

Notably, defendant was not under 21 years of age when he committed the prior "strike" convictions; nor was there proof that his criminal record was influenced by a drug addiction. (Contra, *People v. Avila*, *supra*, 57 Cal.App.5th at pp. 1141–1142, 1144–1145; *People v. Dryden* (2021) 60 Cal.App.5th 1007, 1031.)

Urging us to reverse, defendant insists that there was only flimsy evidence that he provided the gun during the uncharged robbery that resulted in a murder by an accomplice. Defendant

suggests that the trial court relied on the statement of the shooter to conclude that defendant supplied that gun.

But the trial court did not say that. Rather, it stated, "according to what I read," defendant provided the gun for that robbery. This appellate record does not contain the evidence of the uncharged robbery, including defendant's statement to the police about it. Thus, it is not fair to conclude that trial court's comments were based on flimsy evidence.

More importantly, and contrary to defendant's argument, as evinced by the full context of the trial court's remarks, the trial court did not place substantial weight on the uncharged robbery. Thus, it did not abuse its discretion.

VII. *No Cumulative Error*

Finally, defendant contends that the cumulative effect of the alleged errors was prejudicial.

"Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.' [Citation.] When the cumulative effect of errors deprives the defendant of a fair trial and due process, reversal is required." (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.)

As set forth above, no errors occurred. And, even if there were, they were harmless. They did not combine to render this trial unfair. (*People v. Cunningham, supra,* 25 Cal.4th at p. 1009 [defendants are entitled to a fair trial, not a perfect one].)

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, J.
ASHMANN-GERST

We concur:

_____, P. J.
LUI

_____, J.
CHAVEZ

54